SO ORDERED.

SIGNED this 28th day of May, 2019.



_____
Robert E. Nugent
United States Bankruptcy Judge

_____

DESIGNATED FOR ONLINE PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

IN RE:

DANIEL L. SCHUCKMAN                    Case No. 17-10834
              Debtor.                  Chapter 7

DANIEL L. SCHUCKMAN

            Plaintiff,           Adv. No. 17-5130

vs.

UNITED STATES DEPARTMENT OF
EDUCATION,
            Defendant.

## <u>MEMORANDUM OPINION</u>

    Student loan debts are not discharged in chapter 7 cases unless the debtor

proves undue hardship by showing three things: an inability to make even minimal

1

loan payments without compromising a minimal standard of living; that the inability to repay will persist into the future; and that debtor has made good faith efforts to repay the loan. When Daniel Schuckman filed this case, he owed $230,587 in student loan debt accumulated over nearly twenty years while he pursued and received bachelor's degrees in psychology and nursing, and a master's degree in counselling. Mr. Schuckman, a father of two teens, works as a nurse, but less than full time so he can preserve the flexibility to attend to one child's medical problems and accommodate his chronic back pain. He has made no payments on his loan, nor has he elected to use any of the repayment plans provided by the Department of Education (DOE) to facilitate payment. Because Mr. Schuckman could make at least the minimum income driven repayments on this debt and has employment potential that belies persistent undue hardship, his student loan debt cannot be discharged.[1]

Findings of Fact

***Personal Background and Employment***

Daniel Schuckman completed his higher education in 2015 when he received his master's degree and began working as a registered nurse in the Lawrence area. He is 42 and a single father of a 15- and 18-year-old. The older child has mental health concerns and, though presently not in school, is only one year from completing high school. Mr. Schuckman suffers from chronic back pain that he

---

[1] Trial of this dischargeability proceeding was held April 16, 2019. Plaintiff Daniel Schuckman appeared in person and by his attorney Martin Peck. The United States appeared by Michelle Jacobs, Assistant United States Attorney.

2

treats with medication, though he cannot take pain medication while on the job. Though he offered no outside medical evidence about the extent of his back problems, he presented a billing record showing that he'd undergone an interlaminar injection for pain in August of 2018.[2] Mr. Schuckman also stated doctors have told him he has a herniated disc. He states his pain is getting progressively worse, negatively affecting his ability to work and otherwise function.

When this case was tried, Mr. Schuckman was exclusively employed as a "PRN" nurse in the intensive care unit at Lawrence Memorial Hospital. "PRN" means "as needed," and in the employment context, it means that Mr. Schuckman is called in when the hospital needs him as opposed to having a full-time equivalent (FTE) position. He gave up his FTE status to earn a higher hourly wage and also to have more flexibility to deal with his older child's health problems. Were he to be a full-time employee, he would be assigned shifts that he couldn't drop without risking his employment. As a PRN nurse, he can work when he is able, but the trade-off is that he lacks any meaningful guarantee of hours. On occasion, he has declined to work hours offered to him. When the hospital's census is low, he works less and, in 2018, he worked fewer than 30 hours per week on average. Though he reported income of over $63,000, he lost group medical coverage in January of 2019 because of his low hours, and purchased individual coverage on the healthcare exchange.[3] While his premium is significantly less, the new coverage has higher

_____

[2] Trial Ex. C at p. 7. This was the sole medical record regarding debtor's back condition offered into evidence.
[3] Trial Ex. D.

3

deductibles than his former group plan, although Schuckman didn't specify those amounts. Schuckman projects his annual income will be around $59,000 in 2019 based upon his most recent paystub.[4]

The elder child's mental health remains in question. According to debtor's testimony, his daughter has undergone various forms of mental health therapy and counselling since 2014 or 2015. She has completed her junior year of high school, but isn't presently enrolled in school. Debtor estimated that in 2018, he incurred medical expenses of $3,000 dealing with his daughter's mental health issues, but only provided 2019 bills or receipts, leaving no support for any 2018 claims.[5] Despite having reached the age of majority, the child remains dependent on Mr. Schuckman and suffers sporadic episodes that require his presence and intervention. Mr. Schuckman did not know whether his exchange medical coverage would cover mental health counselling or other therapy.

### *Education*

---

[4] Trial Ex. G.

[5] *See* Trial Ex. C. The statements and billings provided contain some duplication. The Court's review of this exhibit show: January 7, 2019 daughter's office visit with family provider where debtor paid $95.00 (p. 6); January 11, 2019 daughter's emergency room visit for total charges of $4,660.80, with debtor's responsibility and billing for $2,695.42 (pp. 9, 8, 4 and 1); January 14, 2019 lab work/bill with debtor's responsibility of $184.36 (p.5) and $67.82 (p. 10); January 16, 2019 lab work/bill with debtor's responsibility of $39.98 (p. 11); February 12, 2019 office visit with family provider reflecting $40 co-pay and remaining balance of $74.25 (p. 3); February 13, 2019 outpatient services for diagnostic MRI of brain (p. 8) and radiologist's services with balance due after insurance of $149.19 (p. 2). These medical expenses total $3,346.02 and may be higher depending upon what insurance pays on the MRI (p. 8). Unlike office appointments, the MRI expense is unlikely to be a recurring charge.

4

Mr. Schuckman began his college education in 1995 at the University of Kansas, studying psychology. He appears to have funded nearly all of his education with student loans. He attended Kansas for one year, was out of school from 1996 to 2000, then re-entered Kansas, studying there until spring of 2002. He borrowed $23,757 to finance his time at Kansas.[6]

He entered Washburn University in the fall of 2002, graduating with a Bachelor of Arts degree in psychology in December of 2005. He borrowed $33,428 to pay for his time at Washburn.[7] He consolidated his Kansas and Washburn loans in April of 2007, by then owing $52,139.[8] There was no evidence about what he did for the next year or so, but he entered St. Edward's University in Austin, Texas in August of 2009 and remained there through the fall semester of 2012, engaged in studies in "major counselling" to obtain a Master of Arts degree. During this period, he borrowed $67,855 for tuition and living expenses.[9] He testified that he'd moved to Austin with his then-wife and the children and took several of these loans to provide for living expenses.[10]

Schuckman returned to northeast Kansas in 2013, enrolling in Mid-America Nazarene University in Olathe to earn a nursing degree. He completed that degree in December of 2013, borrowing another $14,797 in the process.[11] He testified that

---

[6] Trial Ex. 12, pp. USA00199-00200.
[7] Trial Ex. 12, pp. USA00198-00199.
[8] Trial Ex. 12, p. USA00198.
[9] Trial Ex. 12, pp. USA00195-00196, 00198.
[10] Debtor indicated that his former wife suffered from mental illness.
[11] Trial Ex. 12, pp. USA00194-00195.

5

he wanted to be closer to his family in Johnson County after his marriage broke up. Before entering the workforce as a nurse, he completed the remaining course work at St. Edward's to receive his counselling degree in the spring of 2015. He borrowed another $27,241 in the process.[12]

In late October of 2015, Mr. Schuckman applied to consolidate all of his student loan debt.[13] That application was approved, and two consolidated loans dated December 4, 2015 were issued; the balances on these consolidation loans as of the date of his bankruptcy petition, May 10, 2017, were $160,757 and $69,830.[14] These amounts include capitalized interest. On the same date as his online application and as part of the consolidation process, Schuckman was required to also complete an online Repayment Plan Request.[15] Because he did not select a repayment option, by default the loan servicer automatically places the debtor in the lowest monthly repayment option, usually an Income-Driven Repayment (IDR) plan.[16] Schuckman made inquiry about IDR nineteen months after he filed bankruptcy.[17]

---

[12] Trial Ex. 12, p. USA00194.

[13] Trial Ex. 10. Schuckman completed a Federal Direct Consolidation Loan Application and Promissory Note (p.USA00156). Following the "Borrower Understandings, Certifications, and Authorizations" section, he signed the "Promise to Pay," indicating "I UNDERSTAND THAT THIS IS A LOAN THAT I MUST REPAY." (p. USA00158-00160).

[14] Trial Ex. 12, p. USA00194 showing date of consolidation loans as December 4, 2015.

[15] Trial Ex. 11.

[16] *Id.* at p. USA00172. The DOE's student loan analyst, Charles Bolander, confirmed that IDR was the lowest repayment option for Mr. Schuckman at the time he applied for consolidation.

[17] *See* Trial Ex. B showing correspondence from loan servicer regarding debtor's IDR inquiry on December 17, 2018.

**6**

### *Finances, Budget, and Standard of Living*

Over the past three years, Mr. Schuckman has worked as many as three jobs at a time, but from 2018 on, he has worked exclusively at Lawrence Memorial Hospital. All of his jobs were nursing jobs; he no longer works as a "call" nurse which involves participating either in home health care or filling in at different hospitals in Northeast Kansas. In 2015, he reported $48,073 gross income and received an income tax refund of $3,500.[18] In 2016, he reported $58,342 in gross income and received a tax refund of $1,286.[19] In 2017, he grossed $62,017 and received a tax refund of $1,145.[20] In 2018, he grossed $63,982 and received a tax refund of $3,492.[21] His children receive several hundred dollars monthly as Social Security Disability Income from their mother who is apparently unable to work. Based on his most recent 2019 paystub, Mr. Schuckman projected that he would gross about $59,000 this year and suggested that he would be unable to work more hours because of his back pain and his daughter's mental health.[22]

The DOE introduced a series of Schuckman's bank statements reflecting many expenditures for fast food or eating out, sometimes as much as $700 per month in addition to grocery expenses.[23] The DOE also noted that Schuckman acquired a new vehicle shortly before filing this case and makes a car payment of

---

[18] Trial Ex. 1.
[19] Trial Ex. 2.
[20] Trial Ex. 3.
[21] Trial Ex. A.
[22] Trial Ex. G. $18,179.24 YTD gross wages ÷ 8 pay periods YTD = $2,272.41 (average gross pay per pay period) x 26 pay periods = $59,082.
[23] Trial Exs. 4-7.

**7**

$445 per month. Debtor's schedule J reflected total monthly expenses of $3,486, some of which have been adjusted upward since filing. This amount includes a food budget of $680; by comparison, the debtor's actual fast food, restaurant and grocery expenditures in November of 2017 were over $1,400.[24]

Mr. Schuckman stated that he had dropped cable TV and reined in his dining expenses, but he noted that he is often too tired or that his back hurts too much to cook after work and he believes that purchasing fresh groceries is just as expensive as dining out or getting takeout food. Otherwise, Mr. Schuckman believes his life prospects are bleak and that he suffers from depression and feelings of hopelessness as a result of the debts he owes, his physical and work limitations, and his daughter's illness.

If Mr. Schuckman remains employed at LMH under his current terms, he can expect to gross $59,000 or an average of $4,916 per month.[25] If we assume that 16% of this is withheld as taxes (the approximate percentage withheld on his Schedule I), his net monthly income would be $4,129.[26] His Schedule J expenses modified according to his trial testimony, and with the expectation that Schuckman adhere more closely to his $680 monthly food budget, would amount to about $3,751. This leaves him $378 in monthly disposable income before considering any tax refunds

---

[24] Trial Ex. 4.

[25] These figures are extrapolated from his most recent paystub admitted at trial, Ex. G.

[26] With the loss of his employer-sponsored group health insurance coverage, Schuckman will no longer have a $540 monthly payroll deduction for health insurance. His current health insurance premium through the healthcare exchange is $150 and is reflected in his increased expenses.

8

he might receive. He makes a $445 monthly car payment that will end in about three years, freeing up more disposable income.

### *Employment and Family Prospects*

Mr. Schuckman testified that he could not work outside Lawrence. His younger child is happy there and likes the school and neighborhood setting. He does not wish to uproot his children at this time. He did not state why he couldn't work in Topeka, 25 miles west of Lawrence, or in the Kansas City metropolitan area, 45 miles east, while living in Lawrence. The Court is aware that many people live in Lawrence and commute for work elsewhere. While there is only one general care hospital in Lawrence, there are many other health care facilities in Topeka and Kansas City.

Mr. Schuckman also testified that he'd worked fewer than 30 hours per week last year as a result of back pain and child care issues.[27] While there is no way to predict how or if those problems will resolve in the future, he certainly has time to work more and, when reasonably healthy and able, he can.

The counselling degree Mr. Schuckman received from St. Edward's appears to be of little value to his employment prospects. When Mr. Schuckman attempted to become a licensed counsellor in Kansas, he learned that he could not take the licensing examination because St. Edward's is not an accredited institution.[28] He presented no evidence about what licensed counsellors can expect to earn. For the

---

[27] Schuckman said a "good week" amounted to three 12-hour shifts, or 36 hours.
[28] Schuckman conceded that he knew this when he enrolled, but had been assured the school would be accredited "soon."

foreseeable future, Mr. Schuckman will likely continue to work (and earn) as a nurse.

### *Student Loan Debt, and Repayment Options*

As of April 9, 2019, a few days before trial, Mr. Schuckman owed student loans totaling $266,183.87.[29] This amount includes accrued interest on his consolidated obligations of $20,763.60 and daily accrual of $47.09.[30] Other than repaying by consolidating, Mr. Schuckman does not appear to have ever made a payment on these loans. Nevertheless, he is not in default. Instead, according to the DOE's witness Charles Bolander, he remains in "forbearance" status because of his pending bankruptcy case and this pending adversary proceeding. While in forbearance, both of Mr. Schuckman's loans continue to bear interest.

Mr. Bolander, a student loan analyst, testified at length about how the DOE administers student loans and described the various repayment plans that might apply to Schuckman. At the high end, he could contract to pay his student loan obligation in full over 30 years at 7%, either by undertaking a fixed payment of $1,759 per month for 30 years ("standard payment") or a "graduated" monthly payment that starts at $1,542 and increases to $2,266 over the 30-year term ("graduated payment").[31] As Mr. Schuckman cannot afford those payments, he is also eligible for income-driven repayment (IDR) options. Under these plans, the student loan borrower does not repay the loan obligation in full. Rather, the

---

[29] Trial Ex. 9.
[30] *Id.*
[31] Trial Ex. 18, p. 5.

**10**

borrower makes monthly payments based on a percentage of his discretionary income and family size for a repayment period of 20 or 25 years, on completion of which any remaining loan balance is forgiven.[32] There are four IDR options, but Mr. Bolander testified that debtor only qualifies for two of them.

Mr. Schuckman's first repayment alternative is income-based repayment (IBR) which entails a 25-year repayment period during which the monthly payment equals 15% of a borrower's "discretionary income," adjusted annually. After 25 years, the remaining loan balance is forgiven. The second is "revised pay as you earn" (REPAYE) which also spans a 25-year repayment period, but whose monthly payment is only 10% of a debtor's discretionary income. For REPAYE's purposes, "discretionary income" is calculated by subtracting from the debtor's gross income an amount equal to 150% of federal poverty guidelines and dividing that by 12.[33] Mr. Bolander stated that, based upon his calculations using the DOE's online repayment tool, and based upon Schuckman's 2017 income, the monthly payment under this plan would start at $251.[34] This is the lowest available payment for Mr. Schuckman and DOE has elected it for him by default.

These payments will be adjusted annually as the debtor's income fluctuates. Income is certified 12 months at a time. So, if a debtor's income increases during the ensuing period, the payment remains the same. But if the debtor certifies that his

---

[32] Trial Ex. 17.  The IDR plans also benefit borrowers by permitting modification of the payment amount at any time due to a change in circumstances that results in a decrease of debtor's income such as a loss of job.

[33] In these IDR programs, the debtor is required to annually certify his income.

[34] Trial Ex. 19, p. 6.

**11**

circumstances have changed, the payment may drop or be eliminated (though the interest continues to run). As long as the debtor continues to make the payments and otherwise comply with program requirements, the debt remaining at the end of 25 years will be forgiven. It appeared that Schuckman would be forgiven about $400,000 in principal and accrued interest at the end of his payment period under the REPAYE plan.[35] Were he to commence paying on this basis and continue to certify his income annually, DOE would report his performance to credit reporting agencies as "paying as agreed."

Mr. Schuckman stated that when he took out some of these loans, the existence of loan forgiveness programs was part of his thinking. He knew that becoming a nurse and taking a job with a not-for-profit institution was one way to obtain forgiveness.[36] There are numerous programs that forgive student loans taken out to pursue occupations that serve the public.

<u>Analysis</u>

Student loans play a prominent role in many bankruptcy cases and in the larger economy. Left unpaid, they present debtors with severe financial obstacles because their balances have often been inflated by accrued, unpaid, and capitalized interest and, of course, because they are largely not dischargeable. Debtors saddled with these loans can hardly move forward with their lives or hope to earn the fresh start that bankruptcy promises. That said, whether repayment of a particular

---

[35] *Id.*

[36] Mr. Bolander noted that the borrower must work on a full-time basis for 10 years with qualifying payments to obtain loan forgiveness.

**12**

debtor's student loans pose him or her undue hardship, the only "exception" to the student loan discharge exception in § 523(a)(8), is to be decided by applying the *Brunner* test to the facts.[37]

That test requires the debtor to demonstrate by a preponderance of the evidence that (1) he cannot maintain a minimal standard of living while making any payment on his student loans; (2) additional circumstances exist that suggest this condition will continue for most of the repayment period; and (3) the debtor has made good faith efforts to repay.[38] Debtor bears the burden of proving all three elements—failure to carry the burden on any one of them is fatal to proving that repayment imposes an undue hardship.[39] I denied the Government's summary judgment motion because I could not determine on that record whether this debtor could maintain a minimal living standard while making even the minimal loan payments provided for by the most generous of the IDR plans.[40] Nor could I determine whether there were "additional circumstances" suggesting that the state of affairs will persist into the foreseeable future. Finally, whether Schuckman was in forbearance or actual default was unclear. The trial shed helpful light on all those issues.

---

[37] *Brunner v. New York State Higher Educ. Services Corp.,* 831 F.2d 395, 396 (2d Cir. 1987). The Tenth Circuit has adopted the *Brunner* framework. *See Educ. Credit Mgmt. Corp. v. Polleys,* 356 F.3d 1302, 1309 (10th Cir. 2004).
[38] *Brunner,* 831 F.2d at 396.
[39] *Polleys,* 356 F.3d at 1307 (citing *Brunner,* if the court finds against the debtor on any one of the three-part test, "the inquiry ends and the student loan is not dischargeable.").
[40] Adv. Doc. 49.

**13**

### *Minimal Standard of Living*

While Mr. Schuckman's situation is no picnic, his standard of living certainly exceeds that articulated by many judges as "minimal." I have seen much worse in this court and there are many reported cases that detail significantly more straitened circumstances than these.[41] Summarized, minimal standards include the following:

> 1. People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.

> 2. People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer. They need telephones to communicate.

> 3. People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.

> 4. People need vehicles to go to work, to go to stores, and to go to doctors. They must have insurance for and the ability to buy tags for those vehicles. They must pay for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.

> 5. People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.

---

[41] *See Regan v. U.S. Dept. of Educ. (In re Regan),* 590 B.R. 567, 574 (Bankr. D. N.M. 2018) (minimal standard of living means "living within the strictures of a frugal budget," quoting *Educ. Credit Mgmt. Corp. v. Murray,* 2017 WL 4222980, at *2 (D. Kan. Sept. 22, 2017)); *Kehler v. Nelnet Loan Servs. (In re Kehler),* 326 B.R. 142, 147 (Bankr. N.D. Ind. 2005) (requiring "more than simply tight finances" to fall below minimal standard of living).

14

6. People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.[42]

Mr. Schuckman and his family have access to each of these things and, even if required to pay $250-$300 in student loan payments, would likely continue to have it.

Courts commonly compare debtor's income to the federal poverty guidelines. Here, 150% of the federal poverty guideline for 2019 is $31,995 annual income for a family of three.[43] Mr. Schuckman's adjusted gross income as reported on his federal tax returns for years 2015-2018 exceeds that amount and this past year was double the poverty guideline.[44]

| Tax Year | AGI | Federal Tax Refund |
| --- | --- | --- |
| 2015 | $48,073 | $3,500 |
| 2016 | $58,332 | $1,286 |
| 2017 | $62,107 | $1,145 |
| 2018 | $63,986 | $3,492 |

In several recent years, Schuckman's tax refund would have paid all or a substantial portion of the minimum student loan repayment; he could adjust his withholding to make that disposable income available on a current monthly basis.[45]

---

[42] *Ivory v. United States (In re Ivory)*, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001).
[43] *See* https://www.uscourts.gov/sites/default/files/poverty-guidelines.pdf.
[44] Trial Ex. 1, 2, 3 and A.
[45] Courts generally consider a debtor's tax refunds as part of debtor's monthly income. *See Piccinino v. U.S. Dept. of Educ. (In re Piccinino),* 577 B.R. 560, 564 (8th Cir. BAP

**15**

And Mr. Schuckman could seek more lucrative work or, at a minimum, work more hours. In short, even without maximizing his income, debtor is well above the federal poverty guidelines.

Schuckman's Schedule I and J, report gross monthly income of $4,365.74, which, after taxes and deductions, amounts to a monthly net income of $3,328.50 against monthly expenses of $3,486.76. This leaves a monthly deficit of <$158.18>.[46] His take home pay is likely understated because he over withholds income tax, but it still exceeds 150% of the federal poverty guideline of $2,666.25 a month. If his average federal tax refund of $2,355.75 were pro-rated monthly, his take-home income would increase by $196.31.[47] In addition, the debtor no longer has a large payroll deduction for his employer's health insurance plan.[48] On the expense side, modestly trimming actual family food expense could yield enough savings to make a student loan payment. As the evidence demonstrated at trial, debtor was not staying within the monthly food budget of $680 reported on Schedule J. The DOE established from bank statements that in some months, an *additional* $700 was spent on fast food or carry out. It was apparent to the Court that debtor had little understanding of his actual food expenditures which far exceeded the budgeted $680.

---

2017); *Gesualdi v. Educ. Credit Mgmt. Corp. (In re Gesualdi),* 505 B.R. 330, 341 (Bankr. S.D. Fla. 2013).
[46] Trial Ex. E.
[47] These calculations do not consider any state tax refunds debtor may have received.
[48] *See* note 26, *supra.*

The *Polleys* court adds that this first part of the *Brunner* analysis "necessarily entails an analysis of all relevant factors, including the health of the debtor and any of his dependents and the debtor's education and skill level."[49] The evidence concerning the debtor's and his daughter's health is incomplete at best. His daughter's mental health or behavioral disorder went unnamed, though his testimony suggested that her behavior is unpredictable. There was no evidence about whether medication or therapy could be employed to the daughter's condition, nor did anyone testify about her prognosis. Mr. Schuckman did not indicate how much time on average he spends attending to her needs.

Schuckman attributes his chronic back pain to a herniated disc that is likely to persist, and may worsen without surgical intervention that he has, so far, resisted. He offered no medical evidence concerning treatment options, his prognosis, or whether his condition posed a permanent impairment that would prevent his working as a nurse. The evidence didn't demonstrate that either debtor's or his daughter's health currently prevents debtor from maintaining a minimal standard of living while paying on his student loan.

As I have expressed in other cases, the magnitude of the 25-year commitment to paying the DOE less than the interest that accrues, and then suffering whatever consequences may attend massive debt forgiveness during a debtor's later years, is truly daunting. But whether it defeats a "minimal standard" varies from case to case. I simply cannot conclude that a debtor with three college degrees, earned after

---

[49] 356 F.3d at 1309.

spending fifteen of twenty consecutive years as a student, and a highly marketable skillset is affected by this in the same way that an older, less-educated debtor with fewer employment and earning prospects would be.[50] While the forgiveness consequences may be dire, they are a long way off and Mr. Schuckman, unlike other debtors to seek this relief, likely has the means to pay some part of this debt now. He failed to carry the burden of proof on this first element of the *Brunner* test.

### *Persistent Condition of Undue Hardship*

Even if I am wrong about the minimal standard of living element, Schuckman did not show that his current financial situation will persist. This second *Brunner* prong requires the existence of additional circumstances indicating that the debtor's state of affairs is likely to persist for a significant portion of the repayment period.[51] As noted above, he can work more and even has a path to full medical coverage if he changes his employment status from PRN to FTE. His eldest child has reached majority and, if the child's health concerns can be addressed, he may not need to extend the level of support he does now. His youngest child will turn 18 in three years and debtor reports this child has no health issues and functions normally. He purchased a new car in 2017 and that car should be paid for by 2022. He has no other long-term debt. As his children reach majority and they leave home, Schuckman's flexibility to seek better paying employment or increase

---

[50] Contrast these facts with those in *Metz v. Educ. Credit Mgmt. Corp. (In re Metz),* 589 B.R. 750 (Bankr. D. Kan. 2018) (finding undue hardship and discharging interest portion of student loans), *aff'd* 2019 WL 1953119 (D. Kan. May 2, 2019).
[51] *Polleys,* 356 F.3d at 1310.

**18**

his hours will improve. As it is, there is no reason he cannot commute to Topeka or Kansas City if he cannot locate a more lucrative situation in Lawrence. Finally, as noted, medical evidence concerning his and his daughter's medical prognosis was lacking.[52] While a debtor need not demonstrate a "certainty of hopelessness," Mr. Schuckman did not show that he will be unable to provide "adequate shelter, nutrition, health care, and the like" in the future.[53]

### Good Faith Efforts to Repay

The good faith inquiry is measured by a debtor's "efforts to obtain employment, maximize income and minimize expenses."[54] "[A] debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his control."[55] With the exception of his elder child's mental health situation,

---

[52] See Burton v. Educ. Credit Mgmt. Corp. (In re Burton), 339 B.R. 856, 874-75 (Bankr. E.D. Va. 2006) (44-year old debtor with bipolar disorder did not establish second prong of Brunner test, given complete lack of corroborative medical testimony regarding impact of debtor's medical condition on future long-term employment); Tirch v. Penn. Higher Educ. Assistance Agency (In re Tirch), 409 F.3d 677, 681 (6th Cir. 2005) (denying discharge of student loan where debtor's testimony that she was unable to work was unsupported by competent medical or psychological evidence); Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner), 309 B.R. 405, 419 (Bankr. E.D. N.Y. 2004) (debtor's failure to provide corroborating evidence of medical condition precluded discharge of student loan); Pace v. Educ. Credit Mgmt. Corp. (In re Pace), 288 B.R. 788, 793 (Bankr. S.D. Ohio 2003) (discharge determination not possible without some corroboration of the medical conditions and how long they will persist).
[53] Polleys, 356 F.3d at 1310 (in applying second part of Brunner test, "certainty of hopelessness" is not required). See Buckland v. Educ. Credit Mgmt. Corp. (In re Buckland), 424 B.R. 883, 889-890 (Bankr. D. Kan. 2010) (stating that the second prong of the Brunner test required a "realistic look into the debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like").
[54] Buckland, 424 B.R. at 890 (quoting In re Innes, 284 B.R. 496, 510 (D. Kan. 2002)).
[55] Id. (quoting In re Faish, 72 F.3d 298, 305 (3rd Cir. 1995)).

Schuckman's financial condition does not result from factors outside his control. Schuckman's food expenditures and voluntarily declining of work hours cut against his efforts to maximize income and minimize expense.[56] So, too, does his apparent unwillingness to broaden his employment search outside of Lawrence.[57] Self-imposed limits or conditions on employment or earning power are inconsistent with maximizing income and acting in good faith.[58]

Schuckman has applied for loan consolidation and not elected into any loan payment plan, but has still benefitted from several forbearance periods.[59] Debtor

---

[56] *Polleys,* 356 F.3d at 1310 (explaining the good faith inquiry and stating that a debtor who willfully contrives a hardship is acting in bad faith).

[57] *See Wolph v. U.S. Dept. of Educ. (In re Wolph),* 479 B.R. 725, 732 (Bankr. N.D. Ohio 2012) (concluding that debtor never really expected to repay her student loan debt where she was unwilling to seek employment in a large metropolitan area where greater prospects for obtaining higher paying legal jobs existed); *Azwar v. Texas Guaranteed Student Loan Corp. (In re Azwar),* 326 B.R. 165, 174 (10th Cir. BAP 2005) (debtor didn't want to move even though he would be paid more by re-locating from Oklahoma City to Dallas and he didn't "feel like" pursuing employment outside of Hertz).

[58] *See Nielsen v. ACS, Inc. (In re Nielsen),* 518 B.R. 529, 535 (8th Cir. BAP 2014) (debtor not entitled to undue hardship discharge of student loan debt when current income is the result of self-imposed limitations); *Sederlund v. Educ. Credit Mgmt. Corp. (In re Sederlund),* 440 B.R. 168, 174-75 (8th Cir. BAP 2010) (no clear error in court's finding that debtor was voluntarily underemployed; debtor's current income was result of self-imposed limitations, rather than lack of job skills); *Clark v. U.S. Dept. of Educ. (In re Clark),* 341 B.R. 238, 253-54 (Bankr. N.D. Ill. 2006) (debtor did not maximize her income in working only three-and-one-half days per week due to chronic pain where her treating physician opined that her fibromyalgia did not prevent her from working full time as radiological technologist).

[59] While a debtor's decision not to take advantage of student loan repayment program is not lack of good faith per se, it is probative on issue of debtor's intent to repay student loan debt. *See Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete),* 412 F.3d 1200, 1206 (10th Cir. 2005) (placing weight on debtor's steps taken prior to filing bankruptcy and focusing inquiry on questions surrounding the legitimacy of the basis for seeking a discharge); *In re Wolph,* 479 B.R. 725, 732-33 (debtor lacked good faith

**20**

completed his last degree in the spring of 2015 and began his nursing career. His last loan consolidation occurred in December of 2015. In May of 2017, debtor filed this bankruptcy (without having made a single loan payment since leaving school) and again benefitted from forbearance status.[60] According to his schedules, debtor's student loan debt of $213,773 comprises some 85% of his total unsecured debt of $251,782.[61] This adversary proceeding to discharge the student loan debt was commenced in September of 2017.[62] After filing bankruptcy and this proceeding, debtor contacted his loan servicer seeking repayment estimates for Income Driven Repayment (IDR) plans.[63] He incurred this debt over a twenty-year period and obtained three degrees in the process. He took these loans with at least some thought about paying less than what is owed and of availing himself of a forgiveness program of some sort. It doesn't seem unreasonable to require him to do exactly that. I cannot conclude that Mr. Schuckman met the good faith prong of the *Brunner* test.

Conclusion

Daniel Schuckman's complaint to discharge his student loan obligations owed

---

where she first chose to "roll the dice" in court and sought a discharge, before attempting to participate in an income repayment program).

[60] *Robinson v. Educ. Credit Mgmt. Corp. (In re Robinson),* 390 B.R. 727, 732 (Bankr. W.D. Okla. 2008) (good faith inquiry should examine steps debtor took to repay prior to filing for bankruptcy).

[61] Doc. 1, p. 28 (Official Form 106E/F).

[62] *See In re Azwar,* 326 B.R. 165, 174 (debtor who attempts to abuse student loan system based on interval between debtor's obtaining a degree and filing of bankruptcy petition is a factor to consider for determining good faith effort to repay; debtor who sought to discharge his student loan three years after obtaining his master's degree was not seeking a discharge in good faith).

[63] *See* Trial Ex. B reflecting debtor's inquiry on December 17, 2018.

to the DOE should be denied because he failed to meet his burden of proof on any of the three *Brunner* elements and that is fatal to his complaint to discharge the student loan debt as an undue hardship. Judgment for the Government will be entered this day.

### ###